UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRANDON DUNCAN, an individual; and AARON HARVEY, an individual,<br><br>                              Plaintiffs,<br><br>v.<br><br>CITY OF SAN DIEGO, a California municipal corporation; RUDY CASTRO, in his individual and official capacity; SCOTT HENDERSON, in his individual and official capacity; and DOES 1-10, in their official capacities,<br><br>                              Defendants. | Case No.:  17-cv-52-BTM-MDD<br><br>**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT; GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>**[ECF Nos. 31, 32]** |

## I.    INTRODUCTION

This cause of action arises under 42 U.S.C. § 1983.  Plaintiffs Brandon Duncan and Aaron Harvey allege the deprivation of their First and Fourth Amendment rights by Defendants City of San Diego and San Diego Police Department ("SDPD") Detectives Rudy Castro and Scott Henderson.  Plaintiffs

were arrested on an arrest warrant issued by a Superior Court judge for violations of California Penal Code Section 182.5 ("CPC § 182.5"), which penalizes active gang participation. However, a different judge later found there was no probable cause to indict or commit Plaintiffs, and dismissed the charges against them. This civil suit followed.

Pending before the Court are the parties' cross-motions for partial summary judgment. Plaintiffs move the Court to grant summary judgment holding that: (1) a reasonably well-trained police officer would have known that the warrant declarations for Plaintiffs' arrests failed to establish probable cause and should not have been presented to a judge, and (2) that the warrant declarations contain false statements and omissions of material information, which were made either recklessly or deliberately. Defendants urge the Court to grant summary judgment holding that Defendants did not violate Plaintiff's constitutional rights or, in the alternative, that Detectives Castro and Henderson are entitled to qualified immunity and should be dismissed.

For reasons set forth below, the Court finds there is no genuine dispute of material fact as to whether the warrant declarations lacked probable cause to arrest Plaintiffs under CPC § 182.5, but that genuine disputes of material fact remain as to Plaintiffs' judicial deception claim, which must go to trial. The Court further concludes that there was no First Amendment violation. Finally, the Court denies both motions for summary judgment with regard to whether Detectives Castro and Henderson are entitled to qualified immunity.

## II.    BACKGROUND

### A. FACTS

In 2013, the Violent Crimes Task Force ("VCTF"), which is comprised of a number of federal and local law enforcement agencies that includes the SDPD

//

//

and San Diego District Attorney's Office, was investigating the Lincoln Park Bloods ("LPK") for gang-related drug trafficking and shootings. (ECF No. 31-2 "Decl. Nikoletich" ¶ 5; ECF No. 31-3 "Decl. Castro" ¶15). SDPD Gang Unit Detectives Rudy Castro and Scott Henderson were each assigned to monitor LPK and investigate crimes they suspected were LPK-related. (ECF No. 31-4 "Decl. Henderson" ¶ 3). Between May and August 2013, there were eight or nine gang-related shootings. (*See* ECF Nos. 32-7, 32-8).

That same summer, in July 2013, the California Supreme Court discussed CPC § 182.5 at length in *People v. Johnson*, 57 Cal. 4th 250 (2013). CPC § 182.5 is a voter-enacted statute that, according to the Legislative Analyst's comments in the ballot pamphlet, was intended to "expand[ ] the law on conspiracy to include gang-related activities." *Id.* at 261 (citing Ballot Pamp., Primary Elec. (Mar. 7, 2000) analysis of Prop. 21 by Legis. Analyst, p. 46). In relevant part, the statute provides: "any person who actively participates in any criminal street gang, with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, and who willfully promotes, furthers, assists, or benefits from any felonious criminal conduct by members of that gang is guilty of conspiracy to commit that felony . . . ." Cal. Pen. Code § 182.5 (internal citations omitted). In *People v. Johnson*, the California Supreme Court held that individuals may be separately charged with conspiracy to actively participate in a criminal street gang. *Johnson*, 57 Cal. 4th at 255. The opinion, released during the spate of shootings in Lincoln Park, piqued the San Diego District Attorney's Office's interest in using CPC § 182.5 to prosecute LPK members. (Decl. Nikoletich ¶ 5).

As early as the fall of 2013, the San Diego District Attorney's Office began working off a "target list" that included Plaintiffs, and told Detectives Castro and Henderson that they were interested in prosecuting LPK gang members under CPC § 182.5. (ECF No. 32-4 "Decl. Lanham" Exh. 7 (Nov. 2013 email chain

detailing section 182.5 "target list" and conversations with Castro); Decl. Castro ¶ 34; Decl. Henderson ¶ 15; Decl. Nikoletich ¶ 5). Detectives Castro and Henderson reviewed the information they had gathered on LPK members and determined they had probable cause to arrest Plaintiffs and thirteen other individuals for violations of CPC § 182.5. (Decl. Henderson ¶¶ 16, 17; ECF Nos. 32-7 at 13:10-16, 32-8 at 13:11-17).

Detective Castro wrote the arrest warrant applications and declarations. (Decl. Castro ¶ 37; Decl. Henderson ¶ 18). In June 2014, Castro submitted the proposed warrant application and declarations to the District Attorney's Office for review. (Decl. Castro ¶ 38). After a round of edits, the reviewing Deputy District Attorney, Kristie Nikoletich, deemed the warrant application and declarations legally sufficient to support a probable cause finding. (Decl. Castro ¶ 38; Decl. Nikoletich ¶ 8). Detective Castro presented the warrant application and supporting declarations to San Diego Superior Court Judge David Gill, who read the documents and, without further questions, signed the warrants in Castro's presence. (Id.)

### 1. Warrant Declarations

Detective Castro's supporting warrant declarations for Duncan and Harvey are each fourteen pages, and discuss gang-related crimes committed by thirteen individuals in addition to Plaintiffs. (*See* ECF No. 32-7 "Duncan Warrant Decl."; ECF No. 32-8 "Harvey Warrant Decl.").

Detective Castro's declaration supporting the warrant application for Duncan's arrest states that "gang members use social media to promote their criminal street gang," and that a review of "Facebook revealed . . . Brandon Duncan (Tiny Doo) . . . had [a] profile page[ ] during 2013." (Duncan Warrant Decl. at 10:16-22). Castro further noted that "[a]ll [suspects] are 'friends' with each other on Facebook and all have posted about their LPK membership." (Id.) It also avers that after two other suspected LPK members were arrested for

gang-related crimes, "Duncan posted on his [Facebook] wall 'Free Lil Hawg and Tae Dip.' " (Id. at 12:6-7).  Finally, Castro's declaration avers that "Charles, Banks, Robinson and Duncan comprise the LPK music group 'Black Angel Music Group.' " (Id. at 12:12-13).

Detective Castro's declaration supporting the warrant application for Harvey's arrest also states that Harvey "aka Baby Struck" had a Facebook page in 2013 and was friends with other suspected LPK gang members, all of whom posted about their gang membership. (Harvey Warrant Decl. at 10:16-22).  The declaration provides the following examples: "[i]n February and April 2013, Charles posted photographs of himself with a group of LPK gang members, including Harvey, Lamberth, and Gray, with several of the men throwing up LPK gang signs and hand signs for 'Crip Killer.'"; and, "[o]n April 29, 2013, [Charles] posted a photo with Lamberth, Harvey and Gray and wrote 'Real niggas come first.' " (Id. at 10:23-26).  The declaration also details a recorded conversation between suspected LPK members Byreese Taylor and Alton Stovall during a prison visit to another suspected LPK member, Franklin Lamberth. (Id. at 6:12-20).  In that recorded conversation, "Lamberth talked about why he was in custody and discussed other LPK gang members.  Taylor told Lamberth that Aaron Harvey (aka Baby Struck) was keeping gang members in order." (Id. at 6:15-16).  The declaration further states that "Charles is the CEO of [Black Angel Music Group], Winters is VP of Business Operations, Harvey and Jones are Operations Assistants and Bank is an artist."  (Id. at 12:13-14).

Based on the foregoing facts, the declaration concludes that Duncan and Harvey "are active members of the Lincoln Park criminal street gang and know members of Lincoln Park engaged in, or have engaged in, a pattern of criminal activity, which includes assaults with firearms, attempted murder and shooting at occupied dwellings, and they promote, further, assists [sic], or benefits [sic] from this felonious criminal conduct, in violation of California Penal Code section

182.5, a felony." (Id. at 13; Duncan Warrant Decl. at 13).

## 2. Arrests

Duncan was arrested at his residence on June 19, 2014 at 5:40 a.m. (ECF No. 53-5 "Duncan Supp. Decl." ¶ 2). He awoke to the "sound of movement outside of the front door" and when he opened the door, he "was immediately confronted by several law enforcement officers who were pointing their firearms" at him. (*Id.* ¶¶ 4,5). The law enforcement officers were executing both an arrest and a search warrant. (ECF No. 64-2). The SDPD investigator's report states that Duncan was arrested per his arrest warrant, and the officers seized only his "White I-Phone." (ECF No. 53-2).

Harvey was arrested on July 17, 2014 in Las Vegas, Nevada. (ECF No. 53-6 "Harvey Supp. Decl." ¶ 2). A team of "approximately fifeen to twenty law enforcement officers accompanied by several unmarked cars and a helicopter" arrested him in a parking lot adjacent to his home. (*Id.* ¶ 3). Harvey was held in Las Vegas for twenty-one days before Detective Castro and Lieutenant Ray Valentin extradited Harvey to San Diego pursuant to a felony warrant. (*Id.* ¶ 5; ECF Nos. 53-3, 53-4).

## 3. Subsequent Proceedings

The amended criminal complaint charged Duncan, Harvey, and thirteen other defendants with multiple counts of "the crime of Criminal Street Gang Conspiracy, in violation of Penal Code 182.5." (*See* ECF No. 32-18 (Counts 11, 13, 14, 16)). The complaint alleges that all named defendants actively participated in a criminal street gang, with knowledge that its members engage in and have engaged in a pattern of criminal gang activity, and that defendants willfully promoted, furthered, assisted, and benefitted from the following crimes allegedly committed by members of the gang: premeditated attempted murder, shooting at inhabited occupied vehicles, shooting at an inhabited occupied structure, and attempted murder. (*See* ECF No. 32-18 (Counts 11, 13, 14, 16)).

Duncan was arraigned on June 20, 2014, and Harvey was arraigned on July 31, 2014. (Decl. Nikoletich ¶10). At a multi-day preliminary hearing for all defendants in November 2014, Judge Gill again found probable cause to believe Defendants Duncan and Harvey violated section 182.5. (Decl. Nikoletich ¶ 11; ECF No. 32-4, Exh. 5). Both Detectives testified at the hearing. (*See* ECF No. 32-10 Prelim. Tr. at p. 86 (Henderson), p. 95 (Castro)).

However, Plaintiffs and other criminal defendants moved to challenge their commitment for lack of probable cause under California Penal Code § 995.[1] (ECF No. 32-10). On March 16, 2015, at the CPC § 995 hearing, Judge Hanoian found that there was no evidence presented at the preliminary hearing or otherwise to support the charges against Duncan or Harvey. (*See* ECF No. 32-9, CPC § 995 Hr. Tr., 192:26-193:21; ECF No. 32-23 (Supplemental Minutes)). Duncan and Harvey were discharged. (ECF Nos. 32-21, 32-22).

**B. Proceedings Before This Court**

Plaintiffs filed the Complaint on January 10, 2017, and the First Amended Complaint ("FAC") on April 14, 2017. (ECF Nos. 1, 15 ("FAC")). Plaintiffs allege eight causes of action under 42 U.S.C. § 1983. (See generally FAC). The FAC alleges violations of each Plaintiff's First and Fourth Amendment rights against

_____

[1] California Penal Code § 995 provides:

(a) Subject to subdivision (b) of Section 995a, the indictment or information shall be set aside by the court in which the defendant is arraigned, upon his or her motion, in either of the following cases:
    (1) If it is an indictment:
        (A) Where it is not found, endorsed, and presented as prescribed in this code.
        (B) That the defendant has been indicted without reasonable or probable cause.
    (2) If it is an information:
        (A) That before the filing thereof the defendant had not been legally committed by a magistrate.
        (B) That the defendant had been committed without reasonable or probable cause.
(b) In cases in which the procedure set out in subdivision (b) of Section 995a is utilized, the court shall reserve a final ruling on the motion until those procedures have been completed.

17-cv-52-BTM-MDD

Detectives Castro and Henderson individually, and the FAC alleges the same constitutional violations against the City of San Diego, Does 1-10 in their official capacities, and the Detectives in their official capacities. (Id.). Defendants timely answered the FAC on May 12, 2017. (ECF No. 17 "Answer").

After conducting discovery, Plaintiffs and Defendants each moved for summary judgment. (ECF Nos. 31 "Def Mot.", 32 "Pl. Mot."). The parties orally argued the motions before the Court on May 22, 2018. (ECF No. 51 "OA"). The Court requested supplemental briefing, and the parties complied. This order follows.

## III. LEGAL STANDARD

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure if the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248-50.

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to establish an essential element of the nonmoving party's case on which the nonmoving party bears the burden of proving at trial. *Id.* at 322-23. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

Once the moving party establishes the absence of genuine issues of material fact, the burden shifts to the nonmoving party to demonstrate that a genuine issue of disputed fact remains. *Celotex*, 477 U.S. at 314. The nonmoving party cannot oppose a properly supported summary judgment motion by "rest[ing] on mere allegations or denials of his pleadings." *Anderson*, 477 U.S. at 256. Rather, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).

The court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he [or she] is ruling on a motion for summary judgment." *Anderson*, 477 U.S. at 255.

## IV.   DISCUSSION

To establish a violation under section 1983, Plaintiffs must prove that Defendants acted under the color of state law and in doing so, deprived them of their constitutional rights. *West v. Atkins*, 487 U.S. 42, 48 (1988).  Neither party contests that Defendants acted under the color of state law.  The motions for summary judgment turn on whether Defendants' actions deprived Plaintiffs of their constitutional rights under the First and Fourth Amendments, and whether Defendants are entitled to qualified immunity.

Under the doctrine of qualified immunity, government officials are protected "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Qualified immunity attempts to balance two important interests: "the need to hold public

officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Because qualified immunity is an immunity from suit, the Supreme Court has repeatedly "stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Id.* at 231–32. To determine whether a police officer is entitled to qualified immunity, a court must consider whether: (1) the officer's conduct violated a constitutional right; and (2) that right was clearly established at the time of the incident. *Id.* at 232. Courts are not required to address the two questions in any particular order. *Id.* at 243.

As to the second prong, the Supreme Court has held that an officer "cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in [his] shoes would have understood that he was violating it, meaning that existing precedent placed the statutory or constitutional question beyond debate." *City & Cnty. Of San Francisco v. Sheehan*, —— U.S. ——, 135 S.Ct. 1765, 1774 (2015) (citations omitted). Just recently the Supreme Court reiterated the "longstanding principle that clearly established law should not be defined at a high level of generality," but instead "must be particularized to the facts of the case." *White v. Pauly*, —— U.S. ——, 137 S.Ct. 548, 552 (2017). A court denying qualified immunity must effectively "identify a case where an officer acting under similar circumstances as [the defendant officer] was held to have violated the Fourth Amendment." *Id.* "This exacting standard gives government officials breathing room to make reasonable but mistaken judgments by protect[ing] all but the plainly incompetent or those who knowingly violate the law." *Sheehan*, 135 S.Ct. at 1774 (citations omitted).

Whether a reasonable officer could have believed that his conduct was lawful is a determination of law that can be decided on summary judgment only if

17-cv-52-BTM-MDD

the material facts are undisputed.  *Lalonde v. Cty. of Riverside*, 204 F.3d 947, 953 (9th Cir. 2000).  "However, a trial court should not grant summary judgment where there is a genuine dispute as to 'the facts and circumstances within an officer's knowledge' or 'what the officer and claimant did or failed to do.' " *Id.* (quoting *Act Up!/Portland v. Bagley*, 988 F.2d 868, 873 (9th Cir. 1993)).

## A. § 1983 Claims Asserting Constitutional Violation

The Court begins by considering whether there was a constitutional violation of Plaintiffs' First and Fourth Amendment rights.  Because the presence or absence of probable cause to arrest Plaintiffs bears on the First Amendment inquiry, the Court begins by determining whether Defendants violated Plaintiffs' Fourth Amendment rights.  *See Nieves v. Bartlett*, ⸺ U.S. ⸺, 139 S.Ct. 1715, 1725-26 (2019) (holding that presence of probable cause to make an arrest will generally defeat claim that arrest was made in retaliation for speech protected by First Amendment).

### a. Fourth Amendment Violation

#### i. Collateral Estoppel

Plaintiffs argue that Defendants are collaterally estopped from arguing probable cause existed to arrest Plaintiffs because the issue was already litigated at the section 995 hearing, where Defendants lost.  (Pl's Mot. at 14-16).  Defendants assert that the issues are not identical because the section 995 hearing involved a different inquiry entirely, and that the City and Defendant Officers were not in privity with the state during the prosecution. (ECF No. 37 at 11-12).

The doctrine of collateral estoppel applies to section 1983 cases. *Allen v. McCurry*, 449 U.S. 90, 105 (1980).  Federal courts follow state law regarding the preclusive effect of state court rulings.  28 U.S.C. § 1738; *ReadyLink Healthcare, Inc. v. State Comp. Ins. Fund.*, 754 F.3d 754, 760 (9th Cir. 2014).  California courts apply collateral estoppel only if the following criteria are met:

17-cv-52-BTM-MDD

First, the issue sought to be precluded from relitigation must be identical to that decided in a former proceeding. Second, this issue must have been actually litigated in the former proceeding. Third, it must have been necessarily decided in the former proceeding. Fourth, the decision in the former proceeding must be final and on the merits. Finally the party against whom preclusion is sought must be the same, or in privity with, the party to the former proceeding.

*Lucindo v. Superior Court*, 51 Cal. 3d 335, 341 (1990). "The party asserting collateral estoppel bears the burden of establishing these requirements." *Id.* Here, the parties dispute only two elements: whether the issues were identical and whether Defendants in the civil case are in privity with the State.

The Court begins by considering whether the City and Detectives are in privity with the State for the purposes of the criminal prosecution. California law does not provide a single, bright line rule for courts to apply in the privity inquiry. Rather, "[p]rivity is essentially a shorthand statement that collateral estoppel is to be applied in a given case; there is no universally applicable definition of privity." *People v. Sims,* 32 Cal. 3d 468, 486 (1982) (quoting *Lynch v. Glass,* 44 Cal. App. 3d 943, 947 (1975)). The California Supreme Court has nevertheless provided some guidance, stating "privity requires the sharing of 'an identity or community interest,' with 'adequate representation' of that interest in the first suit, and circumstances such that the nonparty 'should reasonably have expected to be bound' by that first suit." *DKN Holdings LLC v. Faerber*, 61 Cal. 4th 813, 826 (2015) (citing *Clemmer v. Hartford Ins.* Co., 22 Cal. 2d 865, 875 (1978)). "A nonparty alleged to be in privity must have an interest so similar to the party's interest that the party acted as the nonparty's 'virtual representative' in the first action." *Id.* "Collateral estoppel has been applied against nonparties who had a proprietary or financial interest in and control of a prior action," or a pecuniary interest "in the determination of a question of fact or law with reference to the same subject matter or transaction." *Ayala v. KC Envtl Health*, 426 F. Supp. 2d

17-cv-52-BTM-MDD

1070, 1090 (E.D. Cal. 2006) (citing *Lynch v. Glass*, 44 Cal. App. 3d 943, 949 (1975); *Stafford v. Russell*, 117 Cal. App. 2d 319, 320 (1953), *cert. denied*, 346 U.S. 926 (1954)).

Plaintiffs assert that the City meets this threshold "given the substantial involvement of the City of San Diego Police Department in the investigation and hearings." (Pl's Mot. at 15). Plaintiffs add that Detective Castro "worked closely with the DA's office throughout the investigation and warrant preparation process" and both Detectives Castro and Henderson served as primary State witnesses and quasi-experts on gang issues at the preliminary hearing. (*Id.* at 15-16). In support of this argument, Plaintiffs rely on *Patzner v. Burkett*, 779 F.2d 1363, 1369 (8th Cir. 1985), in which the Eighth Circuit applied North Dakota law and determined that privity existed between the police officers and the criminal prosecution. But Plaintiffs ignore the Eighth Circuit's decisions interpreting other state law and concluding that privity does not exist in the scenario now before the Court. *See Turpin v. County of Rock*, 262 F.3d 779, 782-83 (8th Cir. 2001) (applying Nebraska law and concluding privity did not exist between officers and criminal prosecution); *Duncan v. Clements*, 744 F.2d 48, 51 (8th Cir. 1984) (applying Missouri law and concluding the same). *Patzner* is thus unavailing, especially given that federal courts applying state law have overwhelmingly concluded "that privity does not exist between law enforcement officers and the criminal prosecution." *Willis v. Mullins*, CIVF046542AWILJO, 2005 WL 3500771, at *9 (E.D. Cal. Dec. 16, 2005) (citing *Kinslow v. Ratzlaff*, 158 F.3d 1104, 1106 (10th Cir. 1998) (applying Oklahoma law); *Tierney v. Davidson*, 133 F.3d 189, 195 (2d Cir. 1998) (applying Vermont law); *Kraushaar v. Flanigan*, 45 F.3d 1040, 1050-51 (7th Cir.1995) (applying Illinois law); *Smith v. Holtz*, 30 F.Supp.2d 468, 477 (M.D.Pa.1998) (applying Pennsylvania law). Moreover, the Ninth Circuit held in *Davis v. Eide* "that police officers are not in 'privity' with the prosecution in a criminal case when the officers have 'no measure of control' over the

proceeding or 'direct personal interest' in its outcome." 439 F.2d 1077, 1078 (9th Cir. 1971). Although *Davis* was decided before the Supreme Court held that federal courts must consider state law in collateral estoppel determinations, "its reasoning remains sound." *Knowles v. City of Benicia*, 785 F. Supp. 2d 936, 944 (E.D. Cal. 2011); *see also Sanders v. City of Bakersfield*, No. CIV-F04-5541 AWI TAG, 2005 WL 6267361, at *12-14 (E.D. Cal. Sept. 30, 2005) (holding privity did not apply because individual police officers did not share sufficient community interest with the criminal prosecution and their financial interests were not represented in the criminal prosecution); *Hornsby v. Cnty. of Tulare*, No. 14-cv-01236 EPG, 2016 WL 2854361, at *5 (E.D. Cal. May 16, 2016) (holding no privity existed between state prosecutors and the defendant officers, who did not participate in litigating the issues, were not witnesses in the state proceedings, and did not have the same stake in the outcome); *Adams v. Nocon*, 2009 WL 799278, at *4 (E.D. Cal. March 23, 2009) (citing *Davis* with approval and noting "the fact that the individual officers do not have counsel in connection with the criminal case" indicates lack of privity) (internal citations omitted); *Saunders v. Knight*, No. CV F 04-5924 LJO WMW, 2007 WL 3482047, at *8–9 (E.D. Cal. Nov. 13, 2007) ("Defendants exercised no measure of control over the criminal action and lacked a personal interest in it. Defendants did not appear as parties or witnesses in the criminal action. The criminal action's preliminary hearing rulings are not entitled to preclusive effect here.").

The Court concludes that Plaintiffs have not met their burden of establishing privity between Defendants and the criminal prosecution. Castro's and Henderson's role in the investigation and testimony at the hearing does not equate to exerting any measure of control over the hearing or having a personal stake in the hearing's outcome. *See Knowles*, 785 F. Supp. 2d at 944. Although the Detectives share the State's general interest in law enforcement, they hardly possessed a direct *personal* stake in the outcome of the hearing. *See Mullins*,

2005 WL 3500771, at *6–7 ("While police do aspire to enforce the law, individual officers cannot be said to have a personal stake in ensuring conviction.").  For instance, neither had a proprietary or pecuniary interest, and neither faced criminal liability.  And however important the detectives' investigation and testimony was to the outcome, the detectives did not exert any measure of control over the hearing itself, which was directed by the District Attorney's office.  Finally, any argument that the State virtually represented the detectives at that hearing is unavailing. *See DKN Holdings LLC*, 61 Cal. 4th at 826.  The Deputy District Attorney arguing against the 995 motion represented the State, not the detectives, and sought to prosecute Plaintiffs for violations of CPC § 182.5, not defend detectives from civil liability for submitting a deficient warrant declaration.  *See Nocon*, 2009 WL 799278, at *4 ("The fact that the individual officers do not have counsel in connection with the criminal case is "critical" to the determination of whether they had a "full and fair opportunity" to litigate the issue."). Given that there was no privity between Defendants and the District Attorney's office, the Court concludes that collateral estoppel does not apply.

### ii. Probable Cause

The Court begins the probable cause analysis by considering whether the warrant declarations set forth facts supporting probable cause for violations of CPC § 182.5.  The statute provides that "any person who actively participates in any criminal street gang, with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, and who willfully promotes, furthers, assists, or benefits from any felonious criminal conduct by members of that gang is guilty of conspiracy to commit that felony." Cal. Pen. Code § 182.5 (internal citations omitted).

The California Supreme Court interpreted the statute in *People v. Johnson*, holding that a conspiracy to commit active gang participation is a valid offense. 57 Cal. 4th 250 (2013).  The opinion, which outlines the government's burden of

17-cv-52-BTM-MDD

proof for conviction under CPC § 182.5, is instructive in ascertaining the required showing for probable cause to arrest. According to the California Supreme Court, an active gang member "cannot be a complete stranger to the gang" and must "be an active gang participant with knowledge of other members' pattern of criminal gang activity."[2] *Id.* at 262. Although the government need not show a prior agreement to commit a crime, they must at a minimum show that the individual acted with "the *required intent* to promote, further, or assist in the commission of a felony by other gang members." *Id.* (emphasis added). CPC §182.5 further "requires the actual commission of felonious criminal conduct as either an attempt or a completed crime." *Id.* Finally, the statute "embraces an active and knowing participant who merely *benefits* from the crime's commission, even if he or she did not promote, further, or assist in the commission of that particular substantive offense." *Id.* (emphasis in original). These benefits must be "proven along with the other elements of the statute" before CPC § 182.5 "permits those benefitting gang participants to be convicted of conspiracy to commit the specific offense from which they benefitted." *Id.* Applying the specific facts of *Johnson*, the California Supreme Court reasoned that those "defendants' agreement to commit the various gang shootings . . . exhibited their intent not only to commit those particular shootings, but also to actively participate in their gang." *Id.* at 264.

---

[2] California court decisions analyzing CPC § 186.22(a), a gang participation statute with elements identical to those of CPC § 182.5 except for the "benefits" provision, are similarly elucidating. "It is not enough that a defendant have actively participated in a criminal street gang at any point in time . . . defendant's active participation must be shown at or reasonably near the time of the crime." *People v. Garcia*, 153 Cal. App. 4th 1499, 1509 (2007). The California Supreme Court "construe[s] the statutory language 'actively participates in any criminal street gang' (§ 186.22(a)) as meaning involvement with a criminal street gang that is more than nominal or passive." *People v. Castaneda*, 23 Cal. 4th 743, 747 (2000).

California Penal Code § 186.22(a) provides "[a]ny person who actively participates in any criminal street gang with knowledge that its members engage in, or have engaged in, a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang, shall be punished by imprisonment in a county jail for a period not to exceed one year, or by imprisonment in the state prison for 16 months, or two or three years."

17-cv-52-BTM-MDD

The Court turns to whether the warrant declarations set forth facts sufficient to support probable cause that Plaintiffs violated CPC § 182.5.  The Court concludes that they do not.  With respect to Duncan, the warrant declaration relies on the following three pieces of evidence:  Duncan's Facebook friendships with suspected LPK members, Duncan's Facebook post stating "Free Lil Hawg and Tae Dip" shortly after their arrests, and Duncan's alleged participation in a musical group with suspected LPK members.  At most, this evidence of Duncan's speech and associations suggests nominal or passive gang membership and common knowledge of the gang's illicit activities, which does not satisfy the "active gang participation" element of CPC § 182.5.  *See Johnson*, 57 Cal. 4th at 262; *People v. Castenada*, 23 Cal. 4th 743, 747 (2000) (construing plain meaning of statutory language "actively participates in a street gang" as "meaning involvement with a criminal street gang that is more than nominal or passive").  Moreover, the warrant declaration sets forth no basis for Castro's assertion that Duncan is part of Black Angel Music Group—Duncan is not alleged to appear in the music video—rendering the allegation entirely conclusory.  Even more glaring, there are absolutely no facts showing that Duncan acted with the required intent to promote, further, or assist with the commission of a felony with other gang members.  Finally, no facts show how Duncan benefitted from the commission of the specific offense.  The declaration does not establish probable cause that Duncan violated CPC § 182.5.

The same is true of Harvey.  Although the warrant declaration provides slightly more detail as to Facebook photographs in which Harvey appeared with LPK members—"several of the men [a]re throwing up LPK gang signs and hand signs for 'Crip Killer'" in one photo—there is no allegation that Harvey himself threw up gang signs or expressed in captions or comments any intent to commit gang-related crimes.  (Harvey Warrant Decl. 10:23-25).  The warrant declaration states that the website for Black Angel Music Group lists Harvey as an

"Operations Assistant[ ]", but then goes on to describe other individuals—not Harvey—rapping about gang activity and bragging that "we really lived what we spittin." (Harvey Warrant Decl. 12:12-22).  The warrant declaration presents no facts showing how Harvey's friendships or involvement in a music group connects him to LPK's criminal activities or evinces his intent to facilitate criminal offenses by other gang members.

The final piece of evidence against Harvey, a recorded prison conversation in which a visiting suspected LPK member reported to an incarcerated member that "Aaron Harvey (aka Baby Struck) was keeping gang members in order," is too vague and lacking in detail to add weight to the probable cause analysis. Although Castro had the transcript available to him, the declaration does not specify what it meant to "keep [ ] gang members in order" or allege Harvey's role in the gang.  Although the warrant declaration might approach establishing probable cause that Harvey was an active gang member, no facts show that Harvey possessed the required intent to promote, further, assist, or benefit from the commission of a felony, nor does the declaration set forth facts showing how Harvey benefitted from the specific substantive offense.  In sum, the warrant declarations do not by themselves support probable cause for either Plaintiff.

But that does not end the inquiry.  The parties dispute whether the Court may look outside the arrest warrant application and declarations.  Plaintiffs argue that the Court is limited to the "four corners" of the documents submitted to the judge, whereas Defendants rely on warrantless arrest cases to urge the Court to consider the totality of circumstances.  Defendants' arguments rely on facts not found within the warrant applications or presented to Judge Gill to argue that probable cause existed, including allegations about Duncan and Harvey's membership in the 5200 Block clique, a subset of LPK; allegations that Duncan's rap music is based on real criminal acts he has committed; and allegations that Duncan and Harvey enjoy the benefits of gang prestige and increased music

sales as a result of the shootings.

The Fourth Amendment is comprised of two clauses: the reasonableness clause and the warrant clause. The reasonableness clause provides, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. Amend. IV. The warrant clause states, "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." *Id.*

A violation of the warrant clause does not necessarily violate the Fourth Amendment's reasonableness clause, the predicate for § 1983 liability. *See Brower v. Cty. of Inyo*, 489 U.S. 593, 599 (1989) ("Seizure alone is not enough for § 1983 liability; the seizure must be unreasonable."); *Graves v. Mahoney*, 821 F.3d 772, 775-76 (6th Cir. 2016) (explaining that "to establish a cognizable Fourth Amendment claim, the plaintiffs must show a violation not of the Warrant Clause but of the Reasonableness Clause" and "violating the Warrant Clause does not invariably violate the Reasonableness clause") (internal alterations and quotations omitted). This is because "the ultimate touchstone of the Fourth Amendment is reasonableness." *City of Los Angeles, Calif. v. Patel*, — U.S. ——, 135 S. Ct. 2443, 2458 (2015). "A warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 152–53 (2004) (citing *United States v. Watson*, 423 U.S. 411, 417–424 (1976)); *Brinegar v. United States*, 338 U.S. 160, 175–176 (1949)). Generally, when an arrest is made in a public place, the reviewing court determines probable cause by looking to the totality of the circumstances and all facts known to the arresting officer at the time of the arrest. *See Maryland v. Pringle*, 540 U.S. 366, 371 (2003).

However, there are other circumstances in which arrests without a valid

17-cv-52-BTM-MDD

warrant are presumptively unreasonable.  *See, e.g.*, *Payton v. New York*, 445 U.S. 573, 587-88 (1980) (holding warrantless arrest in the home presumptively unreasonable).  When an arrest is per se unreasonable absent a valid warrant, the court reviewing the seizure for probable cause is limited to the information presented to the magistrate at the time of the warrant application. *See, e.g.*, *Whiteley v. Warden*, 401 U.S. 560, 565 n. 8 (1971) ( "[A]n otherwise insufficient affidavit cannot be rehabilitated by testimony concerning information possessed by the affiant when he sought the warrant but not disclosed to the issuing magistrate."); *United States v. Castillo*, 866 F.2d 1071, 1076 (9th Cir. 1988) ("Our review [of the arrest warrant] is limited to the information contained within the four corners of the underlying affidavit."); *United States v. Solomon*, 432 F.3d 824, 827 (8th Cir. 2005) ("When the [issuing judge] relied solely upon the supporting affidavit to issue the warrant, 'only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause.'"); *United States v. Vigeant*, 176 F.3d 565, 569 (1st Cir.1999); *United States v. Etheridge*, 165 F.3d 655, 656 (8th Cir. 1999); *United States v. Weaver*, 99 F.3d 1372, 1377 (6th Cir. 1996).[3]  Bearing these principles in mind, the Court addresses the facts of each Plaintiff's arrest separately.

### 1. Duncan

Duncan was arrested at 5:40 a.m. inside his home in Spring Valley, CA. (ECF No. 53-5 "Duncan Supp. Decl." ¶ 2).  Duncan heard movement outside his

---

[3] The briefing and oral argument focused extensively on *Chrisman v. Field*, in which the Ninth Circuit held "[i]t is well settled that an invalid arrest warrant does not negate the validity of an arrest which is supported by probable cause." 448 F.2d 175, 176 (9th Cir. 1971).  But *Chrisman* is inapposite. The criminal defendant in *Chrisman* was arrested in an automobile, which is subject to an exception to the warrant requirement due to "the exigency created by the inherent mobility of vehicles as well as the relatively minimal expectation of privacy that exists with respect to automobiles." *United States v. Scott*, 705 F.3d 410, 416 (9th Cir. 2012).  Probable cause determinations require courts to consider the totality of the circumstances in automobile arrests, just as in other public places or scenarios involving exceptions to the warrant requirement. *See id. Chrisman* does not address arrests that are per se unreasonable absent a warrant, such as arrests in the home. *See Payton*, 445 U.S. at 587-88.  It therefore does not bear upon whether the Court should limit itself to the four corners of the warrant or consider the totality of the circumstances in the instant case.

17-cv-52-BTM-MDD

front door, and when he opened it, he was met by officers with their guns drawn. (Id. ¶¶3-4). The officers entered his residence without his consent, ordered him to the ground, and restrained him by hand cuffing his wrists. (Id. ¶ 6). Duncan was taken into custody thereafter. (Id. ¶ 7).

Absent exigent circumstances, an arrest in a person's home without a warrant is presumptively unreasonable. *Payton*, 445 U.S. at 587-88. Defendants do not argue the existence of exigent circumstances, but instead assert that Duncan voluntarily exposed himself to the public when he opened the door. (ECF No. 64 at 2-3; ECF No. 73 at 6). However, Defendants' invocation of the knock-and-talk exception to the prohibition against warrantless arrests in the home is unavailing because that exception "does not apply when officers encroach upon the curtilage of a home with the intent to arrest the occupant," as they did here. *United States v. Lundin*, 817 F.3d 1151, 1160 (9th Cir. 2016). Defendants' reliance on *United States v. Vaneaton*, 49 F.3d 1423, 1425 (9th Cir. 1995) fails, as the Ninth Circuit noted that *Vaneaton* is on "infirm ground" and suggested that the rule announced in *Lundin* controls. *Lundin*, 817 F.3d at 1160-61.

Alternatively Defendants argue that a valid search warrant authorized the officers' entry into the home, and Duncan was arrested incident to that search. (ECF No. 64 at 2-3; 73 at 6). But the search warrant did not authorize Duncan's arrest. The Court concludes that Defendants' citation of *Michigan v. Summers*, a case in which the Supreme Court held that temporary detention of an occupant of a premises being searched for contraband pursuant to a valid warrant did not violate the Fourth Amendment, is factually inapposite. *Michigan v. Summers*, 452 U.S. 692, 705 (1981) ("[W]e hold that a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted."). Here, there was not a temporary detention, and the arresting officers did not find any contraband that conferred probable cause to arrest Duncan—just a white i-

17-cv-52-BTM-MDD

Phone. (ECF No. 53-2). Unlike the individual in *Michigan*, who was detained incident to a valid search, here, the officers encroached on Duncan's home with the intention to arrest him. *See id.* The Court thus concludes that no exception to an arrest warrant applies. Duncan's arrest required a warrant, and the Court may consider only the facts contained in the declaration for the warrant in its probable cause determination.

### 2. Harvey

Harvey was arrested on July 17, 2017 in Las Vegas, Nevada, where he was residing at the time. (ECF No. 53-6 "Harvey Supp. Decl." ¶ 2). The United States Marshals Fugitive Task Force ("FTF"), comprised in part by Las Vegas Metropolitan Police Department officers, was surveilling his apartment because they had received a warrant for Harvey's arrest from the San Diego Police Department. (ECF No. 73-7 "LeBlanc Decl." ¶¶1-3; ECF No. 72-2 "LeBlanc Depo." 4:25-5:3). Harvey lived in an apartment complex with a gated parking lot. (Harvey Supp. Decl. ¶¶ 2, 3; LeBlanc Decl. ¶ 7-8). Harvey walked out of his apartment and entered his car, which was parked in the gated lot adjacent to his apartment. (Harvey Supp. Decl. ¶ 3). Harvey was ordered to exit his car. The officers then restrained, handcuffed, and took Harvey into custody. (*Id.* ¶ 4). Detective Castro traveled to Las Vegas to extradite Harvey, who was in the custody of the Las Vegas Metro Police Department for twenty-one days after his arrest. (Harvey Supp. Decl. ¶ 5; ECF No. 53-4).

The Court first addresses Defendants' argument that a warrant was not required for Harvey's arrest because "Nevada law allows a police officer to arrest a person without a warrant 'upon reasonable information' that the accused committed an out of state felony. (*Id.* at 8). The Court concludes that both federal and state law require the state seeking extradition to produce documents showing probable cause, which precludes Defendants' argument that the Court should consider facts not contained within the four corners of Castro's warrant

17-cv-52-BTM-MDD

declaration.

The federal extradition statute, set forth in 18 U.S.C. § 3182, implements Article IV, Section 2 of the United States Constitution.[4]  Its violation may give rise to section 1983 claims.  *See Draper v. Coombs*, 792 F.2d 915, 920 (9th Cir. 1986).  The federal extradition statute provides:

> Whenever the executive authority of any State or Territory demands any person as a fugitive from justice, of the executive authority of any State, District, or Territory to which such person has fled, and *produces a copy of an indictment found or an affidavit made before a magistrate of any State or Territory*, charging the person demanded with having committed treason, felony, or other crime, certified as authentic by the governor or chief magistrate of the State or Territory from whence the person so charged has fled, the executive authority of the State, District, or Territory to which such person has fled shall cause him to be arrested and secured, and notify the executive authority making such demand, or the agent of such authority appointed to receive the fugitive, and shall cause the fugitive to be delivered to such agent when he shall appear. If no such agent appears within thirty days from the time of the arrest, the prisoner may be discharged.

18. U.S.C. § 3182 (emphasis added).  "[T]he statute prohibits a state from extraditing an individual upon the simple request of another state; rather, the extraditing state must first determine whether the petitioner has been charged with a felony in the demanding state." *Draper*, 792 F.2d at 920.  An extradition without Castro's accompanying warrant declaration, which the court has determined lacked probable cause, would thus violate the federal statute.

Violations of state extradition statutes similarly may give rise to section 1983 claims. *See id.* at 921.  The relevant Nevada statute, NRS § 179.205, reads

_____

[4] Art. IV, section 2, cl. 2 provides that:

> A person charged in any State with Treason, Felony or other Crime, who shall flee from Justice, and be found in another State, shall on Demand of the executive Authority of the State from which he fled, be delivered up, to be removed to the State having Jurisdiction of the Crime.

17-cv-52-BTM-MDD

in its entirety:

> The arrest of a person may be lawfully made also by any peace officer or a private person, without a warrant upon reasonable information that the accused stands charged in the courts of a state with a crime punishable by death or imprisonment for a term exceeding 1 year; *but when so arrested the accused must be taken before a judge or magistrate with all practicable speed and complaint must be made against the person under oath setting forth the ground for the arrest as in NRS 179.203*. Thereafter the answer shall be heard as if the person had been arrested on a warrant.

Nev. Rev. Stat. § 179.205 (emphasis added). The referenced statute, NRS § 179.203, requires the judge or magistrate to issue a warrant predicated "on the oath of any credible person before any [Nevada] judge or magistrate" or "the affidavit of any credible person in another state" stating the accused has committed a crime in another state.

An arrest without Castro's oath and affirmation would have violated Nevada's extradition statute. Moreover, Harvey was taken into custody for twenty-one days until SDPD officers arrived to effect the extradition. The Court further notes that the arresting officer testified that but for the arrest warrant and Castro's declaration, they would not have effectuated the arrest. (LeBlanc Depo. 37:17-18 -38:1-18). Unlike warrantless arrests, a showing of probable cause or "reasonable information" must be made through oath or affirmation. A simple request to arrest is insufficient. *Draper*, 792 F.2d at 920. Given the foregoing, an arrest absent Castro's warrant declaration would have violated both the federal and state extradition statutes. The Court is thus limited to reviewing the four corners of the warrant declaration to determine probable cause.

### 3. Conclusion

Both Duncan and Harvey's arrests were per se unreasonable absent a valid warrant. Accordingly, in reviewing the arrests for probable cause, the Court considers only the information presented to the judge who signed the warrants.

17-cv-52-BTM-MDD

Because the warrant declarations lack probable cause, as discussed above, the Court concludes that Plaintiffs have established a constitutional violation under the Fourth and Fourteenth Amendments.  The Court grants Plaintiffs' Motion for Summary judgment as to this issue.

### iii.  Judicial Deception

Plaintiffs also support their Fourth Amendment claims under a theory of judicial deception.  Defendants take issue with the fact that Plaintiffs did not allege this theory in their First Amended Complaint.  However, a Plaintiff is not required to plead any particular legal theory under which recovery is sought, but instead all that is necessary is that he plead facts sufficient to support such claims.  *See Crull v. Gem. Ins. Co.*, 58 F.3d 1386, 1391 (9th Cir. 1995); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  The Court is unpersuaded by Defendants' argument and will proceed to discuss the merits of this claim.

To survive summary judgment on a claim of judicial deception, a section 1983 plaintiff need not establish specific intent to deceive the issuing court.  *See Lombardi v. City of El Cajon*, 117 F.3d 117, 1124 (9th Cir. 1997).   Instead, "the plaintiff must (1) establish that the warrant affidavit contained misrepresentations or omissions material to the finding of probable cause, and (2) make a 'substantial showing' that the misrepresentations or omissions were made intentionally or with reckless disregard for the truth."  *Bravo v. City of Santa Maria*, 665 F.3d 1076, 1083 (9th Cir. 2011).  If a plaintiff meets these two requirements, then the matter must go to trial.  *Id.*

False statements and omissions contained in an affidavit are material "if the affidavit, once corrected and supplemented would not have provided a magistrate judge with a substantial basis for finding probable cause."  *United States v. Stanert*, 762 F.2d 775, 782 (9th Cir. 1985).  As to the second requirement, a plaintiff need only show that the officers "intentionally or recklessly made false statements or material omissions" to the authorizing magistrate.

17-cv-52-BTM-MDD

*Lombardi*, 117 F.3d at 1124.

Plaintiffs claim that Detective Castro either intentionally or recklessly omitted or misrepresented facts as to both Duncan and Harvey. As to Duncan, Plaintiffs assert, and Defendants concede, that he did not post "Free Lil' Hawg and Tae Dip," but another individual did. Plaintiffs also contend that the declaration falsely states that Duncan is member of Black Angel Music Group and that the music group is a part of the LPK gang. The only fact that remains as to Duncan is that he was Facebook friends with LPK members charged in the shootings.

As to Harvey, Plaintiffs argue that Detective Castro intentionally or recklessly misled Judge Gill by stating that Harvey was "keeping gang members in order." Plaintiffs argue that the transcript reveals that Harvey told people to stop "drinkin', smokin' all that," i.e., to not do drugs, which does not equate to "keeping gang members in order." (Lanham Decl., Exh. 14 at 22:20–27). Though the parties dispute what the prison recording implicates about Harvey's role in the gang, construing the facts in the light most favorable to Plaintiffs, this a noteworthy misrepresentation given that Defendants relied on this statement to suggest that Harvey is a "gang leader." Plaintiffs also contend that the declaration misleadingly implies that Harvey was flashing "gang signs" in a photograph posted by Darryl Charles when in fact Harvey is the only individual *not* displaying "gang signs." As to both Duncan and Harvey, the declarations state that all thirteen individuals listed in the declarations are Facebook friends with each other, so as to imply that they are all connected LPK gang members. However, Plaintiffs assert that in fact not all of these individuals were even connected through Facebook. Last, Plaintiffs argue that the declarations omitted the fact that police had no evidence that Duncan and Harvey were even aware that the shootings had taken place.

After reviewing all of the alleged misleading statements and omitted facts,

17-cv-52-BTM-MDD

the Court concludes that Plaintiffs have sufficiently established a claim of judicial deception at this stage. As discussed above, the warrant applications in their original form already lack probable cause. Moreover, given that the declarations only contained a handful of factual allegations particular to Duncan and Harvey, these misrepresentations and omissions change the entire calculus. Thus, at this stage, Plaintiffs have made a substantial showing of either intentional or reckless deception. Accordingly, the Court denies both motions for summary judgment as to this claim and allows the claim to proceed to trial.

### b. First Amendment Claim

Given the Court's holding that the warrant declarations lack probable cause, Plaintiffs' First Amendment claims become more salient. Plaintiffs argue that Defendants impermissibly based their probable cause determination on constitutionally protected activity, violating the First Amendment. (ECF No. 32-1 at 7). Plaintiffs further contend that because the evidence presented—social media posts, photographs, and rap lyrics—formed the cornerstone of the case against them, they were in effect targeted for that speech. Defendants argue that because speech integral to criminal conduct is not constitutionally protected, Defendants reasonably relied on social media posts, photographs, and rap lyrics to establish probable cause that Plaintiffs met the elements of section 182.5. (ECF No. 37 at 8).

The First Amendment prohibits any law abridging the freedom of speech, which "as a general matter . . . means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *United States v. Stevens*, 559 U.S. 460, 468 (2010). However, the right to free speech "is not absolute." *Ashcroft v. Am. Civil Liberties Union*, 535 U.S. 564, 573 (2002). "[T]raditional narrow carve-outs to the First Amendment, 'long familiar to the bar,' allow Congress to restrict certain types of speech 'including obscenity, defamation, fraud, incitement, and," in relevant part here, "speech integral to

17-cv-52-BTM-MDD

criminal conduct.' " *United States of America v. Sineneng-Smith*, 910 F.3d 461, 470 (9th Cir. 2018) (quoting *Stevens*, 559 U.S. at 468 (internal quotation marks and citations omitted)).

In order to demonstrate a First Amendment violation, Plaintiffs must show (1) they were engaging in constitutionally protected activity; (2) Defendants' acts "would chill or silence a person of ordinary firmness from future First Amendment activities"; and (3) that deterring Plaintiffs' speech "was a substantial or motivating factor" in Defendants' conduct. *See Mendocino Envtl. Ctr. v. Mendocino Cty.*, 192 F.3d 1283, 1300 (9th Cir. 1999).

With respect to the first prong, Defendants argue that Plaintiffs' speech was not constitutionally protected because it was integral to criminal conduct. The Court disagrees. Defendants have not shown that the "sole immediate object" of Plaintiffs' speech was to facilitate a criminal offense, or explained how Plaintiffs' speech was integral to criminal conduct. *See Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 498 (1949). Although rap may be introduced in criminal trials as speech integral to criminal conduct, and is probative of state of mind and motive for the purposes of gang enhancements, rap tracks are typically introduced in conjunction with other evidence that the defendant made an overt act to commit the charged crime, not as criminal conduct in and of itself. *See e.g.*, *People v. Zepeda*, 167 Cal. App. 4th 25 (2008) (rap lyrics introduced to show motive and state of mind of defendant charged with substantive offense—shooting rival gang member in the back and murdering rival's son—and to support charged gang enhancement).

As for the second prong, the Ninth Circuit has recognized that the threat of retaliatory arrest, or even informal measures such as an investigation, would chill a person of ordinary firmness from engaging in future First Amendment activities. *See Ford v. City of Yakima*, 706 F.3d 1188, 1193 (9th Cir. 2013), *abrogated on other grounds by Nieves*, 139 S. Ct. 1715 (citing *Lacey v. Maricopa Cty.*, 693

17-cv-52-BTM-MDD

F.3d 896, 917 (9th Cir. 2012); *White v. Lee*, 227 F.3d 1214, 1228 (9th Cir. 2000)).  Plaintiffs have demonstrated that there is a chilling effect that these arrests have on the Lincoln Park community and its law-abiding residents who may engage in rap lyrics.  (*See generally* ECF No. 32-2 "Bowser Decl.").

However, nothing in the record suggests that deterring Plaintiffs' speech was a substantial or motivating factor for Defendants' conduct.  Defendants' goal was to fulfill elements of CPC § 182.5, not deter the speech itself. *See Giboney*, 336 U.S. at 498 ("The First Amendment does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent.").  Although Defendants' near exclusive reliance on Plaintiffs' speech in the warrant application is troubling, Plaintiffs were not targeted *for* their speech or associations with LPK members, but rather because their speech and association with LPK members allegedly supported violations of CPC § 182.5.  Because chilling speech was not the but-for cause of the arrests, there was no First Amendment violation.  The Court grants summary judgment to Defendants as to the First Amendment claims.

### c. Detective Henderson

"A person 'subjects' another to the deprivation of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made." *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978).  Although there must be a "requisite causal connection," it may be established "not only by some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury." *Id.* at 743-44.

The parties do no completely separate the actions of Detectives Castro and Henderson as to the obtaining of the arrest warrants.  Henderson was a lead

investigating officer, and one of only two gang unit detectives in the Lincoln Park area. In that capacity, he was part of the causal chain that led to Plaintiffs' arrests. However, the record is not clear on what role Detective Henderson played in the preparations of the warrant declarations. Thus, there is not a basis to decide whether Detective Henderson did or did not commit an affirmative act, or set into motion a series of act that he should reasonably have known would result in constitutional injury to Plaintiffs. *See Duffy*, 588 F.2d at 743-44. The Parties have not moved for summary judgment based on Detective Henderson's individual actions.

## B. Qualified Immunity

Having concluded that a reasonable factfinder could find that Detectives Castro and Henderson engaged in judicial deception that resulted in the violation of Plaintiffs' constitutional rights, the Court must further determine whether the contours of the violated rights were sufficiently "clearly established" before it denies them qualified immunity. *See Pearson*, 55 U.S. at 232. An officer "cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in [his] shoes would have understood that he was violating it, meaning that existing precedent placed the statutory or constitutional question beyond debate." *Sheehan*, 135 S.Ct. at 1774; *see also Lalonde*, 204 F.3d at 953. In relevant part here, "an officer who seeks an arrest warrant by submitting a complaint and supporting affidavit to a judge is not entitled to immunity unless the officer has an objectively reasonable basis for believing that the facts alleged in his affidavit are sufficient to establish probable cause." *Malley v. Briggs*, 475 U.S. 335, 339 (1986).

The record establishes that the Detectives and District Attorney's Office were testing CPC § 182.5 in light of a new California Supreme Court opinion interpreting its reach, and there was little case law on point. Both an Assistant District Attorney and a very experienced Superior Court judge agreed that

17-cv-52-BTM-MDD

Detective Castro's declarations established probable cause for the arrests. However, because questions of fact remain as to Plaintiffs' judicial deception claims, the Court cannot ascertain whether Detectives Castro and Henderson had "an objectively reasonable basis" for believing the warrant declarations were sufficient to establish probable cause. *See Chism v. Washington State*, 661 F.3d 380, 393 (9th Cir. 2011) ("We have consistently applied the rule that summary judgment on the ground of qualified immunity is not appropriate once a plaintiff has made out a judicial deception claim." (citing *Liston v. Cnty. Of Riverside*, 120 F.3d 965, 972 (9th Cir. 1997); and *Hervey v. Estes*, 65 F.3d 784, 788 (9th Cir. 1995))); *Butler v. Elle*, 281 F.3d 1014, 1024 (9th Cir. 2002) ("[N]o reasonable officer could believe that it is constitutional to act dishonestly or recklessly with regard to the basis for probable cause in seeking a warrant. Accordingly, should a factfinder find against an official on this state-of-mind question, qualified immunity would not be available as a defense."); *Lalonde*, 204 F.3d at 953 ("A trial court should not grant summary judgment where there is a genuine dispute as to 'the facts and circumstances within an officer's knowledge' or 'what the officer and claimant did or failed to do.'"); *Walczak v. San Bernardino Cty.*, 260 F. App'x 982, 984 (9th Cir. 2007) (Officers are "only entitled to summary judgment based on qualified immunity if there are no genuine issues of material fact in dispute" because "whether the false statements were made deliberately or recklessly is a factual determination for the jury." (citing *Bias v. Moynihan*, 508 F.3d 1212, 1218–19 (9th Cir. 2007); and *Hervey*, 65 F.3d at 788)). For this reason, the Court cannot grant summary judgment to any party at this time on the question of whether Detectives Castro and Henderson are entitled to qualified immunity. Both Defendants' and Plaintiffs' Motions for Summary Judgment on the issue of whether Defendants are entitled to qualified immunity are denied.

## V. CONCLUSION

17-cv-52-BTM-MDD

The Court hereby:

(1) GRANTS Plaintiffs' Motion for Summary Judgment that the warrant declarations lacked probable cause and constitute a Fourth and Fourteenth Amendment violation;

(2) DENIES both Defendants' and Plaintiffs' Motion for Summary Judgment on the intentional and reckless misrepresentations claims, which must proceed to trial.  To the degree that such claims are not in the complaint, leave is granted to amend solely to include those claims by August 31, 2019;

(3) GRANTS Defendants' Motion for Summary Judgment that Defendants did not commit a First Amendment violation; and,

(4) Denies both Plaintiffs' and Defendants' Motions for Summary Judgment on the issue of whether Detectives Castro and Henderson are entitled to qualified immunity.

**IT IS SO ORDERED.**

Dated:  August, 5, 2019

_____
Honorable Barry Ted Moskowitz
United States District Judge

17-cv-52-BTM-MDD